People v Lopez (2024 NY Slip Op 24207)

L[*1]

People v Lopez

2024 NY Slip Op 24207

Decided on July 26, 2024

Supreme Court, New York County

Conviser, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on July 26, 2024
Supreme Court, New York County

The People of the State of New York

against
Anthony Lopez, Defendant.

Ind. No. 75738/2023

New York County District Attorney Alvin L. Bragg, Jr. (Siobhan D'Angelo and Madison Meyer of counsel) for the People.
James Phillips and James Magee for the Defendant.

Daniel Conviser, J.

This case raises a number of related issues of first impression arising from the United States Supreme Court's recent decision in Erlinger v. United States, 144 S Ct 1840 (2024). Erlinger, expanding on a doctrine which had been established in a number of closely related earlier Supreme Court decisions, held that under the Fifth and Sixth amendments, facts which conclusively establish a higher sentencing range for a convicted criminal offender must be found to have been proven beyond a reasonable doubt to a unanimous jury with one "narrow exception": "the fact of a prior conviction". 144 S Ct at 1853-1854 (quotations omitted). Under New York's predicate felony offender sentencing statutes, however, juries are explicitly prohibited from making a number of decisions essential to imposing predicate felony sentences. Such determinations must be made by courts.
One of those determinations necessary to impose a predicate offender sentence in this case was the question of whether, in calculating whether a sentence for a defendant's prior conviction was imposed not more than ten years prior to the commission of an instant offense (a necessary finding to impose many predicate sentences), the calculation of the ten year period should be "tolled" by the period of incarceration the defendant served between the time of the commission of the prior and instant felony. See, PL § 70.04 (1) (defining a sentence of imprisonment for a second violent felony offender).
The court holds that: (i) as both parties in this case agreed, tolling determinations under New York's persistent violent felony offender sentencing statute after Erlinger must be proven beyond a reasonable doubt and found by a unanimous jury; (ii) such a procedure is explicitly prohibited by New York law; (iii) the court is not entitled to use its "inherent authority" to create an entirely new procedure for bifurcated jury trials, consisting of guilt and then secondary punishment related decisions (a position the People disagreed with); and (iv) the court was therefore not entitled in this case to sentence the defendant as a "persistent violent felony offender" or a "second violent felony offender", and was rather required to sentence him as a [*2]first felony offender.
Statement of Facts
This simple case is the archetype of a "petit larceny which becomes a first degree robbery" New York courts confront every day. The Defendant, a person with a long criminal history including prior convictions for burglary and attempted burglary, was alleged to have shoplifted a Hugo Boss jacket from the Macy's flagship store at Herald Square in Manhattan. This was the Class A misdemeanor of Petit Larceny. When confronted by a Macy's loss prevention officer in the building vestibule, however, the Defendant allegedly brandished a knife. This elevated the charge to the Class B violent felony of Robbery in the First Degree. The entire episode was documented on video. The People were also prepared to call the loss prevention officer and a police officer who arrested the Defendant. The People planned to introduce both the stolen jacket and knife into evidence.
A first offender convicted of this robbery crime would be subject to a determinate sentence of between 5 and 25 years followed by a period of post-release supervision. PL § 70.02 (3) (a). The People alleged, however that Mr. Lopez, by virtue of his prior violent felony history, was a "persistent violent felony offender". This would subject him to a mandatory indeterminate sentence with a maximum term of life imprisonment and a minimum period of imprisonment of between 20-25 years. PL § 70.08. That is higher than the mandatory minimum sentence for second degree murder. See PL 70.00 (3) (a) (i).
As the pre-trial suppression hearing in the case began, after extensive earlier unsuccessful plea discussions, the Defendant pled guilty with the People's consent to the Class C violent felony of Attempted Robbery in the First Degree with a promised determinate sentence of 3 ½ years followed by a period of 5 years of post-release supervision. He had earlier rejected a plea offer before another judge to a non-violent felony with an indeterminate sentence promise of 1 ½ - 3 years. The 3 ½ year determinate sentence was the minimum term for a first violent felony offender. It would be an unlawful sentence for a persistent violent felony offender. The People urged that, had the trial proceeded and the defendant was convicted, the court should keep the jury and ask them to make the tolling determination necessary to impose a persistent violent felony offender sentence, in compliance with Erlinger. The court said it did not believe it had that authority. The Defendant appeared in court walking with a cane and obvious difficulty. He is 52 years old and facing significant health issues. His most urgent concern during his plea allocution, other than the promised sentence, was whether the court could do anything to help him get better health care in prison.
In a predicate felony statement filed with the court the People alleged that the Defendant had a sentence imposed for the violent felony offense of Burglary in the Second Degree on May 21, 2003. The People also alleged the Defendant was sentenced for the violent felony offense of Attempted Burglary in the Second Degree on February 16, 2011. The instant crime was alleged to have been committed on October 10, 2023. To qualify as a "second violent felony offender" the defendant's prior sentence for Attempted Burglary in the Second Degree "must have been imposed not more than ten years before the commission of the felony of which the defendant presently stands convicted". PL § 70.04 (1) (b) (iv). That would also be necessary for the Defendant to be a "persistent violent felony offender". See PL 70.08 (1) (b). That did not occur in this case because the prior sentence was imposed on February 16, 2011 and the instant crime occurred on October 10, 2023, a period of more than ten years. 
The People alleged this prior conviction was a valid predicate because of tolling. They [*3]alleged the Defendant was incarcerated from March 15, 2011 to June 18, 2018. With tolling, the 2011 sentence would qualify as a valid predicate offense for the purpose of a second violent felony or persistent violent felony offender sentence. See PL § 70.04; 70.08. Without tolling, it would not. Although not essential to the predicate violent felony offender determination, the People also alleged that the time between Mr. Lopez's first violent felony conviction and second conviction was tolled by incarceration from June 10, 2003 to June 22, 2010.
 CONCLUSIONS OF LAW
Erlinger v. United States
The majority decision in Erlinger was written by Justice Gorsuch and joined by 5 additional justices. Chief Justice Roberts and Justice Thomas issued concurring opinions. Justice Kavanaugh issued a dissenting opinion in which Justice Alito jointed and Justice Jackson joined in part. Justice Jackson also issued a dissenting opinion. The case concerned the Armed Career Criminal Act, a federal statute which provides enhanced sentences upon defendants who previously committed three violent or drug offenses on "occasions different from one another". Erlinger, 144 S Ct at 1846 (citation omitted). The majority held that this "different occasions" determination had to be made by a jury with proof beyond a reasonable doubt.
The defendant pled guilty in the case and at the sentencing hearing the government alleged that within a span of days, 26 years before the instant charge, Mr. Erlinger had committed 4 different business burglaries on different days thus meeting the different occasions test. The defendant disagreed, arguing his crimes occurred during a single criminal episode and thus did not meet the test. The trial court found the different occasions test had been met and rejected the Defendant's request for a jury determination. On appeal, the government changed its position and agreed that the different occasions inquiry required a jury finding given "the intensely factual nature" of the question. Id. at 1847-1848. Despite this concession, however, the Court of Appeals did not disturb the judgment and the case reached the Supreme Court.
Surveying the history of the Constitution and Bill of Rights, the majority held that the Fifth and Sixth amendments protect liberty by "requiring a unanimous jury to find every fact essential to an offender's punishment". Id. at 1850 (citations omitted). In Apprendi v. New Jersey, 530 US 466 (2000), the Erlinger court explained, the Supreme Court had found unconstitutional a New Jersey law which provided an increased sentence based on a judicial finding by a preponderance of the evidence that a crime was motivated by racial bias. The Erlinger court said that under Apprendi, "[o]nly a jury may find 'facts that increase the prescribed range of penalties to which a criminal defendant is exposed'". Erlinger, 144 S Ct at 1850, quoting Apprendi, 530 US at 490. "Virtually any fact that increases the prescribed range of penalties to which a criminal defendant is exposed must be resolved by a unanimous jury beyond a reasonable doubt (or freely admitted in a guilty plea)." Id. at 1851 (quotations omitted).
The Erlinger majority then discussed the Supreme Court's decision in Almendarez-Torres v. United States, 523 US 224 (1998) in which it announced a narrow exception to the Apprendi rule which allowed a judge "to undertake the job of finding the fact of a prior conviction — and that job alone". Id. at 1853 (citation omitted). The majority went on to criticize but not overrule the Almendarez-Torres exception calling it "arguably incorrect", an "unusual . . . exception to the Sixth Amendment rule" and a decision which Justice Thomas, whose vote was essential to the majority's holding in Almendarez-Torres, had urged be overruled. Id. (quotations and citations omitted). Historical arguments made in amicus briefs in Erlinger, in the majority's view, "provide[s] perhaps more reason to question Almendarez-Torres's narrow exception than [*4]to expand it". Id. at 1857. "Under that exception, a judge may do no more, consistent with the Sixth Amendment, than determine what crime, with what elements, the defendant was convicted of. We have reiterated this limit on the scope of Almendarez-Torres over and over to the point of downright tedium". Id. at 1854 (quotations and citations omitted).
The majority allowed that under Almendarez-Torres, a court might also use written materials [apparently without a jury finding] for one additional discrete related purpose. "[A] court may need to know the jurisdiction in which the defendant's crime occurred and its date in order to ascertain what legal elements the government had to prove to secure a conviction in that place at that time". Id. at 1854. As will be discussed infra, this language might allow courts in New York to make certain findings essential to a predicate determination, like whether a sentence on a predicate conviction occurred prior to and within ten years of the commission of an instant felony. See e.g., PL § 70.04 (outlining the requirements for a finding that a defendant is a second violent felony offender). The majority cautioned, however, that "[n]one of that, however, means that a court may use Shepard documents [documents typically used in federal courts to make predicate sentencing calculations] or any other materials for any other purpose". Erlinger 144 S Ct at 1854. The majority acknowledged that while judicial predicate findings on the "separate occasions" issue in some cases might raise significant factual issues, in others those issues would be straightforward and not require significant scrutiny. It noted, however, that "[t]here is no efficiency exception to the Fifth and Sixth Amendments". Id. at 1856. The Supreme Court vacated the judgment of the circuit court. 
Chief Justice Roberts' brief concurring opinion said that violations of the Erlinger rule should be subject to harmless error review. Justice Thomas' concurring opinion, while not urging the overruling of the Almendarez-Torres exception in Erlinger itself, said that Almendarez-Torres was an "error" "we should revisit". Id. at 1861 [Thomas J., concurring] (quotation and citations omitted). Justice Kavanaugh's dissenting opinion asserted that judges were authorized to make the "different occasions" decision. He noted that this had been the unanimous prior conclusion of all 12 federal circuit courts. He asserted that the Supreme Court's precedents on the issue distinguished between facts about a current crime, which had to be determined by a jury, and facts about prior crimes for purposes of sentencing enhancements, like the "different occasions" inquiry, which could be found by courts. He also opined that, if the trial court in Erlinger had erred in making the "separate occasions" determination, that error should be subject to a harmless error analysis and not void the trial court's sentence.
Justice Jackson in her dissent, opined that Apprendi had been wrongly decided and that judges should have discretion to make factual determinations relevant to punishment. She did not advocate for overruling Apprendi but, like Justice Kavanaugh, objected to what she considered the doctrine's expansion by the majority. "The Sixth Amendment's jury-trial right guarantees a jury's determination of acts that constitute the elements of a crime — no more and no less". Id. at 1878 [Jackson, J. dissenting] (quotations omitted). She outlined what she believed was the flawed policy of allowing judges wide latitude to find sentencing facts and make discretionary decisions within sentencing ranges, with Erlinger's prohibition on judicial fact-finding necessary to define the mandatory outer perimeters of permissible sentences. 
Justice Jackson explained that by requiring jury findings for mandatory sentencing rules, Apprendi had encouraged legislatures to avoid the creation of such rules and instead give judges the unfettered power to make discretionary sentencing decisions, unencumbered by Apprendi's strictures. This in turn, she opined, had led to greater sentencing disparities. She argued that [*5]requiring juries rather than judges to make the "different occasions" findings would make such decisions both less fair and less efficient.
Under Erlinger, the Tolling Decision Must be Made by a Jury
To be sentenced as a persistent violent felony offender in this case the defendant was required to have "two or more predicate violent felony convictions". PL § 70.08 (1) (a). To determine whether such predicate convictions occurred, the statute requires that the criteria for determining whether a defendant is a second violent felony offender pursuant to PL § 70.04 (1) (b) be applied. See PL § 70.08 (1) (b). That provision, in turn, requires that in determining whether a sentence on a prior conviction was "imposed not more than ten years before the commission of the felony of which the defendant presently stands convicted" (a requirement for a prior conviction to count as a predicate under the statute; see PL § 70.04 (1) (b) (iv)), a tolling rule applies. That tolling rule says that: "In calculating the ten year period under subparagraph (iv), any period of time during which the person was incarcerated for any reason between the time of commission of the previous felony and the time of commission of the present felony shall be excluded and such ten year period shall be extended by a period or periods equal to the time served under such incarceration;" PL § 70.04 (1) (b) (v). As noted earlier, the application of this toll was required in order for the defendant to be a persistent violent felony offender.
Both of the parties in this case agreed that the tolling determination under this statute after Erlinger must be made by a jury. The court agrees. The Erlinger decision is clear. Under Erlinger, "[o]nly a jury may find 'facts that increase the prescribed range of penalties to which a criminal defendant is exposed'". Erlinger, 144 S Ct at 1850, quoting Apprendi, 530 US at 490. "Virtually any fact that increases the prescribed range of penalties to which a criminal defendant is exposed must be resolved by a unanimous jury beyond a reasonable doubt (or freely admitted in a guilty plea)." Id. (quotations omitted). The Erlinger Court also discussed the parameters of the exception to the Apprendi rule the court had earlier outlined in Almendarez-Torres. "Under that exception, a judge may do no more, consistent with the Sixth Amendment, than determine what crime, with what elements, the defendant as convicted of. We have reiterated this limit on the scope of Almendarez-Torres over and over to the point of downright tedium". Id. at 1854 (quotations and citations omitted). In this case, were the factual tolling finding made by the court, it would increase the Defendant's sentencing range from 5-25 years to 20-25 years to life imprisonment. This factual tolling finding would fall outside the Almendarez-Torres exception as construed in Erlinger.
There are a number of related arguments which can be made against this conclusion. The strongest, in this court's view, is that tolling calculations are generally undisputed and thus a court can take judicial notice of them. Such determinations are not "fact-finding" which would trigger Erlinger's jury trial requirement. "Judicial notice of a fact . . . means a court's declaration of the existence of a fact normally decided by the trier of fact, without requiring proof of that fact". NY Guide to Evidence, § 2.01 (1) Judicial Notice of Facts. Among the kinds of facts which may be judicially noticed are "facts that are capable of ready and accurate determination by resort to sources whose accuracy cannot reasonably be questioned;" Id.§ 2.01 (2) (b). See People v. Jones, 73 NY2d 427, 431 (1989).
The Criminal Procedure Law, however, does not allow tolling calculations to be determined through judicial notice. It establishes a detailed adversary process courts must follow to make such determinations. See CPL 400.15; CPL 400.16 (2). The People must first file a document supported by evidentiary facts establishing tolling periods. The defendant can [*6]then controvert the allegations. If the allegations are contested the court must then conduct a hearing and find the facts necessary to support a predicate sentence to have been proven beyond a reasonable doubt. The only difference between this procedure — and what Erlinger requires — is that the determination under New York law is made by a judge rather than a jury.
A related argument is that the "different occasions" determination considered in Erlinger will often be more fact-intensive than the simple and usually uncontested ministerial calculation of the number of days a defendant was previously incarcerated at issue here. That is certainly true. The line Erlinger drew, however, does not allow courts to make determinations about a defendant's right to a jury trial based on how much factual scrutiny a court determines a particular category of sentencing inquiry demands.
A third related argument is that whatever criticisms might be made about requiring juries to make "different occasions" decisions, having a jury decide tolling issues would make even less sense. A New York trial court in a 2004 decision relied on such arguments in concluding that juries were not required to make tolling decisions under Almendarez-Torres. People v. Miles, 5 Misc 3d 271, 283-284 (Sup Ct, NY County 2008 [Kahn, J.]), aff'd on other grounds, 49 AD3d 446 (1st Dept 2008), lv denied 10 NY3d 867. The trial court noted the trustworthiness of incarceration records, their ministerial quality, the appropriateness of allowing courts to take judicial notice of them and their status as "sufficiently divorced from fact-finding" to fall outside Apprendi's rules. In the view of this court, however, after Erlinger, an inviolate line has been clearly drawn which does not permit courts to make these decisions. This court does not believe it makes policy sense to apply Erlinger to tolling decisions, as discussed infra. But that does not mean the rule can be avoided. There have been occasions, moreover, when disputes about tolling or other predicate issues have had to be determined by New York appellate courts. The question is not always undisputed. See, e.g. People v. Cassese, 58 AD3d 639 (2nd Dept 2009); People v. Small, 112 AD3d 857 (2nd Dept 2013), affirmed as modified, 26 NY3d 253 (2015); People v. Leon, 10, NY3d 122 (2008).
When appellate courts impose clear rules, and unanticipated future fact patterns make it obvious the rules should be inapplicable to those unanticipated facts, courts frequently find ways to reinterpret rules to avoid objectionable results. A New York trial court, however, should obviously not be in the business of forecasting the future of United States Supreme Court rulings. Even were this court inclined to do that, however, there is no need to guess at the direction the Supreme Court is likely to take on future Apprendi questions. The Erlinger majority took pains to argue why Apprendi should be expanded, rather than contracted, by overruling even the narrow exception provided by Almendarez-Torres, which allows courts without juries to decide only the fact of a prior conviction. That exception, according to the 6 justice majority, was "arguably incorrect". Erlinger, 144 S Ct at 1853. The Erlinger majority said it had chosen not to overrule Almendarez-Torres in Erlinger, despite a number of justices criticizing it. "[N]o one in this case has asked us to revisit Almendarez-Torres. Nor is there need to do so today". Id. Justice Thomas' concurring opinion predicted that there would be "no shortage" of cases which would allow the doctrine to be revisited. "Each term, criminal defendants file a flood of petitions specifically presenting this Court with opportunities to reconsider Almendarez-Torres. 144 S Ct at 1861 [Thomas J., concurring] (citation and quotation omitted). 
Finally, it might be argued that tolling rules are equivalent to an analogue to the Almendarez-Torres exception recognized in Erlinger: "[A] court may need to know the [*7]jurisdiction in which the defendant's crime occurred and its date in order to ascertain what legal elements the government had to prove to secure a conviction in that place at that time". Id. at 1854. Thus, Erlinger held, these facts might also be properly determined by a judge. In rejecting an Apprendi challenge to New York's persistent violent felony offender sentencing law in 2008, the New York Court of Appeals held that testimony identifying the defendant as the person who had prior convictions through fingerprint comparisons was part of the "who, what, when and where of a prior conviction" and thus permissible under Apprendi. Leon, 10 NY3d at 126 (2008) (quotation omitted). Perhaps, it might be argued, tolling rules could be deemed an equivalent kind of analogue, since a determination about what prior sentence a defendant received was inherent in a finding that a prior conviction occurred.
There are three problems with this argument. The first is that knowledge about the number of days a defendant was incarcerated following a conviction is completely unnecessary to determine the fact of a prior conviction itself. The second is that New York's tolling rules do not concern the sentence a defendant receives at the time of a prior conviction. It concerns the actual number of days a defendant was subsequently incarcerated. That is a calculation which is unknowable at the time of a sentence. That is so because offenders sentenced to determinate sentences for violent felonies may or may not earn "good time" which reduces the number of days a defendant is incarcerated. See generally PL § 70.40. If a conviction occurred prior to 1998 (when first violent felony offenders were first subject to determinate sentences; see L 1998, ch 1) or 1995 (when violent felony offenders with a prior conviction were first subject to determinate sentences; see L 1995, ch 3) individual variability between imposed sentences and the number of days in prison will be greater, since such offenders were subject to indeterminate sentences eligible for parole. Offenders with prior determinate sentences imposed for violent felony convictions may also violate the terms of post-release supervision, resulting in additional periods of incarceration which are unknowable at the time of a conviction.
Finally, even were Apprendi limited as Justice Kavanaugh advocated - by allowing judges to determine facts about prior convictions while requiring juries to find facts about current ones — tolling rules are not clearly on either side of this divide. The number of days a defendant is incarcerated prior to an instant conviction may only become known many years after a prior conviction occurred. Measured by this metric, the tolling decision at issue here is even more arguably now a mandatory jury question than the "different occasions" determination in Erlinger, since the "different occasions" determination at least solely concerns prior convictions.
In People v. Quinones, 12 NY3d 116, 123 (2009) the New York Court of Appeals held that New York's discretionary persistent felony offender statute applicable to non-violent felony offenders [not at issue here, see PL § 70.10] did not violate Apprendi. That was so, the court explained, because the sole fact which allowed the persistent felony offender sentence to be imposed was the defendant's two prior convictions. The additional findings required by the statute to impose a persistent felony offender sentence, the court said, were "a qualitative judgment" which then authorized sentencing within a statutorily prescribed range. 12 NY3d at 130. See also, People v. Prindle, 29 NY3d 463, 466-467 (2017) (upholding New York's discretionary persistent felony offender sentencing statute since "the sole determinant of whether a defendant is subject to recidivist sentencing" is the existence of two prior convictions"); People v. Rosen, 96 NY2d 329 (2001) (same). The tolling rule at issue in this case does not apply under New York's discretionary persistent felony offender law. In contrast to the case [*8]before them, the Quinones court said, sentencing schemes which violate Apprendi provide "for an increase to defendant's punishment — beyond the range authorized by the jury's finding of guilt or defendant's admission — based on additional facts found by a judge". 12 NY3d at 123 (citations omitted). After Erlinger, the tolling rule fits within these parameters.
The Criminal Procedure Law Prohibits Juries
From Making Predicate Sentencing Determinations
A second fact is indisputable. Juries are explicitly prohibited from making tolling decisions under the Criminal Procedure Law. The procedure for determining whether a defendant is a persistent violent felony offender is contained in CPL 400.16. That section requires that the procedures in CPL 400.15 for determining whether a defendant is a second violent felony offender are applicable to persistent violent felony offender adjudications. That section, inter alia, requires the People to provide a statement detailing "the date of commencement and the date of termination as well as the place of imprisonment for each period of incarceration to be used for tolling of the ten year limitation". CPL 400.15 (2). Where the defendant controverts any allegations in the statement the court must then conduct a hearing. The statute provides: "A hearing pursuant to this section must be before the court without jury". CPL 400.15 (7) (a). Under the statute, the proof must be beyond a reasonable doubt. The Criminal Procedure Law's extensive provisions outlining how jury trials are conducted also make plain that juries make determinations about guilt — not punishment. See CPL articles 260, 270, 280, 290, 300 & 310. 
The Court Cannot Use its "Inherent Authority" to Create
A Completely New Type of Bifurcated Jury Trial Which is Prohibited by New York Law
The People urged that in the event of a conviction, the court conform with Erlinger by posing the tolling question to the jury. They also sought permission to discuss with the jury during voir dire the fact that jurors would be asked to make an additional finding if they reached a guilty verdict, without telling the jury what that finding would concern. They cited Judiciary Law § 2-b (3) for the proposition that in light of Erlinger, this court was entitled to create an entirely new bifurcated jury trial process, even though such trials were explicitly prohibited by the Criminal Procedure Law. Judiciary Law § 2-b (3) allows courts "to devise and make new process and forms of proceedings, necessary to carry into effect the power and jurisdictions possessed by it."
The doctrine of inherent authority "is, by its very nature, not susceptible to precise definition". Gabrelian v. Gabrelian, 108 AD2d 445, 451 (2d Dept 1985), appeal dismissed, 66 NY2d 741. The uncertain parameters of inherent authority mean that reasonable minds can differ about whether a new procedural form is permissible. The court did not believe it had the inherent authority to create a bifurcated jury trial process in this case for multiple reasons, which are next discussed.
The Statutory Ban on Bifurcated Jury Trials 
Prohibits the Use of Inherent Authority to Create Them
Two decisions of the New York Court of Appeals on the parameters of inherent authority, in the Court's view, are particularly instructive with respect to the question here: People v. Wrotten, 14 NY3d 33 (2009) and People v. Ricardo B., 73 NY2d 228 (1989). In [*9]Wrotten , the Court of Appeals found the trial court's allowance for an out-of-state complainant who was unable to travel to New York because of age and health concerns to testify instead by real-time two way video before a jury in a criminal trial was a proper exercise of the court's inherent authority. In Ricardo B., the Court of Appeals approved the use of two juries to consider manslaughter charges against co-defendants because an inculpatory statement by one defendant was inadmissible at the trial of the other pursuant to Bruton v. United States, 391 US 123 (1968). In both cases a dispositive consideration was that the new procedure fashioned by each trial court did not violate and indeed was consistent with closely related statutes governing their proceedings. 
In Wrotten, it was dispositive that "no specific statutory authority evincing legislative policy proscribing televised testimony [of the kind the court permitted] existed." 14 NY3d at 38. The Court of Appeals explained that vulnerable child witnesses were permitted to testify through live video by statute. It also noted that the statute in which child witness authority was granted provided that "[n]othing herein shall be construed to preclude the court from exercising . . . any authority it otherwise may have to protect the well-being of a witness and the rights of the defendant". Id. quoting CPL 65.10 (3). "Nowhere does the CPL purport to list all instances where live video testimony is permissible or all possible solutions to the problem of an unavailable witness". Id. 
Similarly in Ricardo B. the Court of Appeals first said that the trial court's fashioning of the two jury procedure was consistent with the legislative preference to have co-defendants tried together to foster judicial economy. The court reasoned that the procedure the trial court had fashioned "while not explicit in the statute, may logically be implied from its terms". 73 NY2d at 233. (citation omitted). The Court of Appeals further explained that the two jury system was consistent with the general procedures the Legislature had adopted in joinder statutes, had been used in other states and was not prejudicial. The issue here is obviously completely different. To conduct a bifurcated jury trial here, this court would have to violate an unequivocal command of the Criminal Procedure Law.
This Case Was Not "Exceptional" But Would Require The Creation of a
New Type of Jury Trial Which Would Then Presumably Be Generally Applicable
There is a second basis of the Court of Appeals' two rulings recognizing inherent authority which is notably absent here. In both Wrotten and Ricardo B., the Court of Appeals approved a limited exception in an unusual factual circumstance. In Ricardo B. the Court directed that the two jury procedure it had authorized "be used sparingly". 73 NY2d at 235. The Court of Appeals in Wrotten did not establish a general procedure allowing witnesses in criminal trials to testify by two-way video. It approved an unusual exception for a crime victim who was "85 years old, frail, unsteady on his feet, and with a history of coronary disease". 14 NY3d at 37. This case again was completely different. There was nothing unusual or extraordinary about the predicate felony determination here. What this court was asked to do was to create an entirely new bifurcated jury process which would then presumably be sought in any case in which the application of tolling rules was necessary.
Indeed, although this court is not ruling on any issue other than whether it may conduct a bifurcated jury trial in order to lawfully impose a persistent violent felony offender sentence requiring tolling, the same tolling rules apply under a range of other New York predicate felony sentencing statutes. See PL § 70.06 (1) (b) (v) (tolling rules necessary for a "Sentence of [*10]imprisonment for a second felony offender"); PL § 70.04 (1) (b) (v) (tolling rules necessary for a "Sentence of imprisonment for a second violent felony offender"); PL § 70.07 (3) (applying tolling rules but with a 15 rather than 10 year period for a "Sentence of imprisonment for a second child sexual assault felony offender").
The doctrine of inherent authority allows courts in exceptional circumstances to "fill in the blanks" of a court's statutory authority in accordance with clear legislative goals to bring justice in rare individual cases. It does not authorize trial courts to create new rules of general applicability. Concededly, the doctrine provides for great flexibility in some cases. Perhaps the best example came in the First Department's decision in People v. Krieg, 139 AD3d 625 (1st Dept 2016), lv denied 28 NY3d 932. There, the court reversed felony convictions because it found the trial court's denial of the defendant's request to attend his trial by video conference was error. The trial court had denied the request, because the statute under which it was made — Article 182 of the Criminal Procedure Law — required the consent of the prosecutor for a defendant to attend a trial by video and that consent was not given.
The First Department found, however, that the trial court should have used its inherent authority to allow the defendant's remote presence because of his compelling unusual circumstances. A paraplegic, he was described as being afflicted with numerous medical conditions and his attendance at trial would have been "extremely physically distressing and often excruciatingly painful". 139 AD3d at 625. Given that, the First Department held, the statute would not have been violated by allowing the defendant's presence through video. Krieg was "an exceptional case" and presented "unusual circumstances". 139 AD3d at 626. The tolling issue here was not unusual in any way.
Principles of Lenity Counsel Against a New Court-Created Bifurcated Jury Trial
"If two constructions of a criminal statute are plausible, the one more favorable to the defendant should be adopted in accordance with the rule of lenity. The mere possibility of articulating a narrower construction, however, does not by itself make the rule of lenity applicable". People v. Roberts, 31 NY3d 406, 423-424 (2018) (quotation and citation omitted). In this court's view, the "rule of lenity" is not directly applicable here. The court is not attempting to construe an ambiguous statute. It is evaluating whether it has the inherent authority to create a procedure prohibited by the Criminal Procedure Law. The result which would occur if this court created a new type of bifurcated jury trial, however, is essential to consider in evaluating this question. 
"[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity. This policy embodies 'the instinctive distastes against men languishing in prison unless the lawmaker has clearly said they should'". United States v. Bass, 404 US 336, 348 (1971) quoting H. Friendly Mr. Justice Frankfurter and the Reading of Statues, in Benchmarks 196, 209 (1967). When a court invalidates a criminal statute, later courts do not generally get to write a new statute to avoid the constitutional infirmity while still punishing the conduct the court believes the Legislature would want to sanction. In this court's view, the same principle should apply to the sentencing provision it believes was invalidated by Erlinger here.
The new bifurcated jury trial procedure the People asked the court to create would require the defendant in this case — who was accused of stealing a coat and then brandishing a knife — to be sentenced to a mandatory indeterminate sentence of 20-25 years to life in prison. In this court's view, if such a new bifurcated jury trial is to be created for the purpose of lawfully [*11]imposing life sentences on such offenders, it must be created by the Legislature.
The Creation of a New Bifurcated Jury Trial Would Require the Court
to Improperly Make Multiple Decisions Best Made by the Legislature
There is an obvious legislative solution to the requirements Erlinger imposed. It is the one the People sought. A statute could be enacted which created a bifurcated jury trial. During the guilt phase, the jury would be told nothing about the defendant's criminal history, unless it was admissible for other reasons. Then, if a conviction occurred, the jury would receive evidence about the tolling issue and asked whether the requisite standard had been met. Indeed, the Erlinger majority itself outlined how it believed such a procedure would eliminate any prejudice a defendant might suffer were a jury provided information about a defendant's criminal history. Erlinger, 144 S Ct at 1859. If only it were that simple. In fact, the Legislature might make any number of policy choices in Erlinger's wake. That would be their prerogative. It is not the prerogative of this court.
Justice Kavanaugh, dissenting in Erlinger, and considering what the implications of overruling Almendarez-Torres might be, outlined some of the policy choices a legislature could make in modifying predicate sentencing rules:
They [state legislatures] could undermine the longstanding limits on introducing evidence at trial of past crimes. They could jettison longstanding sentencing enhancements for recidivists. They could mandate costly and inefficient bifurcated trials in cases with a recidivism enhancement, a fairly dramatic change to day-to-day criminal trial practice in many jurisdictions. Or they could simply enact discretionary sentencing regimes and authorize sentences within a broad range for most crimes, leaving to judges' discretion the choice within that range. 144 S Ct at 1873 [Kavanaugh, J. dissenting] (citation omitted).
On a more granular level the Legislature might choose to direct judges to tell juries they would be called upon to make a second determination if they reached a guilty verdict or might decide no such notice should be given. Judges might be directed to ask juries how many days the defendant had been incarcerated — or to ask juries more broadly if the tolling requirement had been met. The current legal instruction that juries not consider or speculate about sentencing or punishment might be retained or modified. Sentence lengths could be changed. And so on. There is currently one provision of the Criminal Procedure Law which outlines procedures for bifurcated jury trials: CPL 400.27. It is an artifact of New York's now invalid death penalty statute, which was declared unconstitutional by the Court of Appeals in People v. Lavalle, 3 NY3d 88 (2004). This now defunct statute goes on at great length to outline how penalty-phase jury trials must be conducted in death penalty cases. See also CPL 270.55 (outlining sequestration rules for capital sentence phase juries). Any bifurcated jury trial statute created to address Erlinger would undoubtedly be much simpler and briefer. But this court is not going to write it.
Two Important Related Issues
In this court's view, Erlinger does not prevent courts without juries from determining that a sentence based on a prior conviction was "imposed before commission of the present felony" and "imposed not more than ten years before the commission of the [instant] felony". See PL § [*12]70.04 (1) (b) (ii); (1) (b) (iv) (requirements for a sentence of imprisonment for a second violent felony offender). Erlinger allowed that "a court may need to know the jurisdiction in which the defendant's crime occurred and its date in order to ascertain what legal elements the government had to prove to secure a conviction in that place at that time". Erlinger. 144 S Ct at 1854. See also Id. at 1858 (discussing the relevance of evidence that "may suggest that in a small number of jurisdictions [after the adoption of the Constitution] judges could find the existence, number and dates of a defendant's prior convictions" and concluding that "none of this provides a persuasive basis for revisiting our many precedents prohibiting judges from doing more".) In this court's view, the link between the date of a prior conviction (permissible under Erlinger without a jury finding) and whether the sentence upon that conviction was imposed prior to and within 10 years of the date of an instant offense can be determined through judicial notice rather than judicial fact-finding.
A second issue which was not before the court here and the court is not ruling on is whether the Erlinger rule should be applied retroactively to sentences which were already final. Such a construction would potentially invalidate thousands of prior lawful sentences. This court rejected that argument in an unpublished decision pre-dating Erlinger in People v. Pivetz, Ind. # 377/2017 (Sup Ct, NY County, February 1, 2024). The defendant in Pivetz has moved for this court to reconsider that decision in light of Erlinger.
The Flawed Policy of Prohibiting Judges From Making Tolling Decisions Under 
Erlinger
This court believes that requiring juries to make tolling decisions does not make sense as a policy matter. This court has presided over felony criminal cases for 17 years. It has never encountered a dispute about tolling which was not easily resolved by both parties looking at corrections records. As my former colleague and later Appellate Division justice Marcy Kahn accurately observed in Miles 20 years ago these calculations are almost always ministerial. They are based on reliable information. In almost all cases they can be characterized as "fact-finding" in only the most rudimentary sense.
The principles the Erlinger majority marshalled to support its holding  based on foundational imperatives about liberty and the court's assessment of the Constitution's original intent — bear little relationship to the question here. Consider this description of Erlinger's underlying rationale:
As John Adams put it, the founders saw representative government and trial by jury as "the heart and lungs" of liberty. Without them, he wrote, we have no other fortification . . . against being ridden like horses, fleeced like sheep, worked like cattle, and fed and clothed like swine and hounds. Reflecting that sentiment, the right to trial by jury in criminal cases was, on one telling, the only right included in every newly enacted state constitution. Erlinger, 144 S Ct at 1848-1849 (quotations and citations omitted).
Judges in New York, aided by prosecutors and defense attorneys, have been making non-contested tolling decisions for decades. One could be forgiven for having trouble imagining one of our founders, transported to our current time, concluding that these routine calculations would be a step towards an existence as a metaphorical beast of burden. As Justice Jackson aptly observed in dissent in Erlinger, "not every sentencing problem is a nail requiring an Apprendi hammer". Id. at 1883 [Jackson, J. dissenting].
Justice Jackson's dissent also outlined the fundamental illogic of the expansion of the Apprendi rule. Judges can consider a range of potentially dispositive facts in making discretionary sentencing decisions, most of which are never proven to a fact finder. These [*13]include whether the defendant has remorse for a crime, his or her history of mental illness or substance abuse, family circumstances, whether the defendant lied during testimony, whether the defendant threatened a witness and how heinous the defendant's criminal conduct was. The court in this case had the discretion to sentence the defendant as a first felony offender to a determinate sentence of between 5 and 25 years. New York law provides no sentencing guidelines which channel sentencing discretion within such ranges. Judges, of course, rely on well-established considerations in deciding sentence lengths. The statutory rules, however, simply tell the judge to pick a number within a range. The only review of such determinations will usually come years later and will only concern whether the Appellate Division believes a lawful sentence was "unduly harsh or severe". CPL 470.15 (6) (b). "A defendant's actual punishment can be affected in a very real way by facts never alleged in an indictment, never presented to a jury, and never proved beyond a reasonable doubt". Apprendi, supra, 530 US at 547 [O'Connor, J. dissenting]. All of this, after Erlinger, is fine.
What offends the Constitution is a judicial determination, usually based on uncontested records, of the number of days a defendant was previously in prison. That is because such a decision is a rule which must be applied to determine a lawful sentence range, rather than an exercise of discretion once a sentence range is determined. As Justice Breyer, dissenting in Apprendi asked: " A sentencing system in which judges have discretion to find sentencing-related factors is a workable system and one that has long been thought consistent with the Constitution; why, then, would the Constitution treat sentencing statutes any differently?" Apprendi, 530 US at 559 [Breyer, J. dissenting].
The answer, of course, comes primarily from the Erlinger court's determination, explained most fully in Apprendi, of what the majority construed as the original intent of the Bill of Rights. As the Apprendi majority explained: "Any possible distinction between an 'element' of a felony offense and 'sentencing factor' was unknown to the practice of criminal indictment, trial by jury, and judgement by court as it existed during the years surrounding our Nation's founding". Apprendi, 530 US at 478. The majority further explained that English trial judges in the late 18th century generally had no discretion in imposing sentences which were specified by law, other than the power of pardon. Id. at 479. Later developments, the Court further outlined, allowed judges to impose sentences within designated ranges. 
Justice O'Connor's four justice Apprendi dissenting opinion argued that the majority "marshals virtually no authority to support its extraordinary rule". Id. at 525 [O'Connor, J. dissenting]). As the Apprendi dissenters noted, the majority outlined how 18th century English judges had no discretion to impose sentences within proscribed ranges. That was no barrier to that practice now, however, since in later years, such authority was recognized in America. Id. at 525 [O'Connor, J. dissenting]. The dissenters asserted that the Apprendi rule as it was outlined by the majority was derived from two references in an 1862 criminal procedure treatise which they argued did not support the principle. Id. at 526. 
The application of Erlinger to tolling also highlights how the use of history as the sole determinant of whether a particular criminal procedure rule is lawful depends on how the Supreme Court defines the parameters of the historical exercise. See New York State Rifle and Pistol Association v. Bruen, 597 US 1, 110 (2022) [Breyer J., dissenting] (providing a detailed exposition of "the difficulties that may befall lawyers and judges when they attempt to rely solely on history to interpret the constitution".) Under such historical analyses courts must first determine which facts, in which historical periods, are most important. Prior to the founding, for [*14]example, English judges could not exercise sentencing discretion. But since American judges did — many years after the Bill of Rights was enacted — such discretion is now lawful. Justice Thomas, concurring in Apprendi, cited extensive court decisions from states to argue that the common-law tradition reflected in the Fifth and Sixth Amendments required facts which increased permissible sentences to always be proven to a jury. Justice O'Connor's dissenting opinion pointed out, however, that these cases primarily came from the 1840's to the 1890's, well after the Bill of Rights was ratified. Apprendi, supra, 530 US at 528 [O'Connor, J., dissenting]. As Justice Breyer dissenting in Apprendi argued "the Constitution does not freeze 19th century sentencing practices into permanent law". Id. 530 US at 559 [Breyer, J. dissenting].
Then, it must be determined whether a current criminal procedural rule should be judged against general principles reflected in the nation's historical traditions or subject to an inflexible prohibition which categorically bars a large category of similar proceedings. Apprendi held that there was a general rule at, around or after the Bill of Rights, which prohibited judicial decisions about sentencing rules. But that general rule may have had nothing to do with how tolling calculations, had they existed at all, might have been perceived at the time the Bill of Rights was ratified. Indeed, it is not clear such ministerial calculations would have been considered sentencing rules at all. 
Judges are obviously ill-suited to determine obscure historical facts and neither of the parties in this case suggested we retain a historian. "Recidivism laws have a long tradition in this country that dates back to colonial times". Almendarez-Torres 523 US at 244 (quotation omitted). Prisons in which offenders were confined for long periods (as opposed to "workhouses" or "jails" for short confinement) were first created as criminal punishments, however, at about the time of the American Revolution. See Professor Ashley T. Rubin, University of Hawaii, "Punishment, Penal History and Penal Change", available on the web. "In colonial times, courts and magistrates would impose punishments including fines, forced labor, public restraint, flogging, maiming and death". Wikipedia, The Free Encyclopedia, "History of United States prison systems". New York's first prison, "Newgate" was opened in Manhattan in 1797. NY Correction Timeline, correctionhistory.org. The Bill of Rights was ratified in 1791. 
Without a historian, the court cannot answer the question of whether, in 1791, when the Bill of Rights was enacted and prisons for long-term confinement were at the dawn of their existence, predicate felony sentences which employed tolling rules existed. But the court would take an educated guess they did not. Prisons which confined offenders for extended periods as punishment had only recently been created. They did not exist in New York at all. Offenders then would be unlikely to have had extended historical records of long-term confinement on which predicate sentence timing rules and precise tolling calculations could be based.
Perhaps if this court had retained a historian, he or she might be able to argue that, by analogy, New York's current rules mirrored rules from colonial times which allowed judges to determine an offender's future punishment based in part on how much time the offender had already spent confined in a pillory, stocks or a workhouse. This court also has no idea how such issues might have been considered when the Fourteenth Amendment was ratified in 1868. But none of that matters. It doesn't matter because the Supreme Court in Apprendi created a general rule applicable to all sentencing practices, based on the Court's assessment of the general practices which existed at various relevant historical periods. 
If this were a firearms regulation a completely different type of historical analysis would apply. When evaluating whether a particular type of firearms regulation with no historical [*15]precedent either prohibiting or supporting it is valid, courts must engage in "reasoning by analogy" between the current rule and a specific prior practice. Bruen, 597 US 1, 28 (2022). If a particular new regulation is "analogous" to a previous one — even if that new regulation did not previously exist in the relevant historical period [whatever that period may be; another topic of debate which garnered extensive discussion by both the Bruen majority and Justice Coney-Barrett's concurrence] — it is permissible. "Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated". Id. Applying Bruen during the high court's recently concluded term to find that the prohibition on possessing firearms pursuant to a domestic violence restraining order statute was lawful, the Court also explained that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition". United States v. Rahimi, 144 S Ct 1889, 1898 (2024) (citation omitted). 
Still another form of historical analysis was evident in the high court's recent decision on presidential criminal immunity: Trump v. United States, 144 S Ct 2312 (2024). There, the court found a president was entitled to a degree of immunity from criminal prosecution for official acts not from the literal text or historical understandings existing at the time of the Constitution's creation. The dissenters argued that such immunity was "never recognized by the Founders, any sitting President, the Executive branch, or even President Trump's lawyers, until now". Trump, 144 S Ct at 2360. [Sotomayor, dissenting]). Rather, the decision was based on the majority's determination of how the separation of powers doctrine enshrined in the Constitution should work. "[U]nder our constitutional structure of separated powers, the nature of Presidential power requires that a former President have some immunity from criminal prosecution for official acts during his tenure in office". Id. at 2327.
The Impact of a Potential New Bifurcated Sentencing Statute
The enactment of a new bifurcated sentencing statute would not have a calamitous impact on the court system. Presumably any such statute would allow tolling determinations to be stipulated to and allow defendants to agree that such calculations could be made by judges. That would likely happen in most cases. On the other hand, since the new right to a jury trial would be a constitutional one, presumably it would be defendants — not their lawyers — who would be entitled to make waiver decisions. Defendants might choose to have jury trials even when tolls obviously applied for any number of reasons.
These new mini-trials would likely be very brief and perhaps feature a single witness, a records custodian from the New York State Department of Corrections and Community Supervision, whose testimony might consume mere minutes. As Justice Jackson explained in discussing the "separate occasions" determination in her dissent, in the rare case where a tolling issue was contested, the new jury system would create a potential for unfairness because jurors would be given information about the defendant's prior criminal record, after having that information usually kept from them during a trial's guilt phase. The Legislature, or judges, would have to decide what to tell jurors about these "mini-trials" both before a guilt phase trial began and during the "tolling trial". One can imagine what jurors would think about these proceedings. After taking days or weeks away from other responsibilities, they would be kept after the primary trial was over to deliberate over what would usually be uncontested facts: "I had to take another afternoon off work  for this?" In Erlinger 3 justices opined that a harmless error standard should apply to violations of the jury trial right it created. Were such a rule [*16]adopted for a new statute in New York it would incentivize disobedience, since virtually any error in not submitting a tolling decision to a jury would be harmless. Of course, this court has no doubt New York's judges would comply with any law the Legislature enacted. None of this — the inefficiency, extra expense, potential for unfairness, new decisions about jury instructions and additional discontent by jurors would have great significance. But all of these negative impacts, in the court's view, would be pointless.
The creation of new jury trials for tolling rules would also raise another important issue. Under current law, predicate sentencing rules are mandatory. A court cannot waive them even with the consent of both parties. See People v. Heisler, 150 AD3d 612, 614 (1st Dept 2017), lv denied 30 NY3d 950. This court chairs the Office of Court Administration's Criminal Law Advisory Committee, a group of judges, retired judges, prosecutors, defense attorneys and a law professor who develop legislative proposals on criminal justice issues which, upon the approval of New York's Chief Administrative Judge, are submitted to the Legislature. We have proposed that such predicate rules should be able to be waived in the interests of justice with the consent of the court, prosecutor and defendant if the court makes findings justifying such waivers. We have also proposed that the mandatory "minimum/minimum" sentences for persistent violent felony offenders be halved — to make those sentencing ranges identical to the ranges which existed before they were doubled in 1995.[FN1]
Thus, the indeterminate sentence in this case under our proposal would be 10-25 years to life imprisonment, rather than 20-25 years to life. 
The prohibition on sentencing predicate felony offenders to non-predicate sentences, however, in practice has not only operated once predicate determinations are made. The prohibition has also been treated as applicable before adjudications occur. That has apparently been based on the notion that when there is no dispute about a defendant's predicate status and tolling, sentencing rules are apparent even before a guilt trial starts and cannot be voided through a plea. If the Legislature gave juries the task of deciding tolling rules, however (or other aspects of predicate sentencing) it is not apparent the prohibition on judges agreeing to waive such rules with party consent would continue. A jury trial on tolling would include the implicit presumption that the jury might decide a toll did not apply and a predicate sentence was unlawful. Given that, why would prosecutors be prohibited from taking pleas with non-predicate sentences which juries might later decide were required? Why would prosecutors have less discretion to agree to non-predicate sentences than they would to allow pleas to lesser included offenses? One never knows what a jury might do.
The Legislature may now be faced with the necessity of revising New York's predicate felony sentencing rules. These long mandatory minimum sentences certainly implicate a host of constitutional and policy concerns. But the imperative to revisit them will not concern any of those issues. It will prompted by the more immediate constitutional imperative of preventing judges from counting how many days a defendant previously spent in prison.
For all of those reasons, the court held that it was required to sentence the defendant in [*17]this case as a first felony offender.
July 26, 2024
Daniel Conviser, A.J.S.C.

Footnotes

Footnote 1:Judiciary's Legislative Program - HOME | NYCOURTS.GOV, Report of the Advisory Committee on Criminal Law and Procedure, 2024, "New Measures" # 3, p. 12 (allowing non-predicate sentences to be imposed on consent) and "Previously Endorsed Measures" # 7, p. 38 (reducing mandatory "minimum/minimum" sentences for persistent violent felony offenders). Neither of these bills have bill numbers since they have not been printed by the Legislature.